# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| NINA SHERVIN, M.D., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 10-cv-10601** |
| ) | |
| PARTNERS HEALTHCARE ) | |
| SYSTEM, INC. et al., ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                        **March 7, 2014**

## I.      Introduction

Plaintiff Nina Shervin, M.D. ("Dr. Shervin") has brought suit against the several

Defendants based on alleged gender discrimination.  D. 38.  Dr. Shervin's complaint alleges:

gender discrimination in violation of Mass. Gen. L. c. 151B ("c. 151B") against Defendants

Partners Healthcare System, Inc. ("Partners"), Massachusetts General Physicians Organization

("MGPO"), the President and Fellows of Harvard College/Harvard Medical School ("Harvard"),

Harry Rubash, M.D. ("Dr. Rubash") and James Herndon, M.D. ("Dr. Herndon") (Counts 1–5);

gender discrimination in violation of c. 151C against Partners and Harvard (Counts 6–7); gender

discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000 *et seq.*, against Partners, MGPO and Harvard (Counts 8–10); retaliation in violation of c.

151B against Partners, MGPO, Harvard, Dr. Rubash and Dr. Herndon (Counts 11–15); retaliation in violation of Title VII against Partners, MGPO and Harvard (Counts 16–18); and tortious interference with advantageous and/or contractual relations against Partners, Dr. Rubash and Dr. Herndon (Counts 19–21).[1]  D. 38.  The Defendants have moved for summary judgment on a number of grounds.  D. 144, D. 145, D. 148, D. 149.  For the reasons discussed below, the Court DENIES IN PART and ALLOWS IN PART Dr. Rubash's motion, D. 144; DENIES IN PART and ALLOWS IN PART Dr. Herndon's motion, D. 145; DENIES IN PART and ALLOWS IN PART Harvard's motion, D. 148; and DENIES IN PART and ALLOWS IN PART Partners' motion, D. 149.[2]  The upshot of these rulings is that the timely claims of discrimination and retaliation brought by Dr. Shervin as well as the interference claims will go forward to trial.

## II.    Facts

As discussed in the Court's legal analysis, a number of the material facts in this case remain disputed.  To the extent a material fact is undisputed, the Court refers to either Harvard's Statement of Material Facts, D. 153, or the remaining Defendants' Amended Joint Statement of Material Facts, D. 172, and Dr. Shervin's responses to same, D. 230 and D. 229, respectively. To the extent Dr. Shervin raises additional allegations, the Court refers only to her additional Statement of Material Facts, D. 217, or her responses to the Defendants' Statements of Material Facts, again D. 229 and D. 230.

### A.    <u>Background</u>

Dr. Shervin, an orthopaedic surgeon, was a medical resident in the Harvard Combined Orthopedic Residency Program ("HCORP"), a five-year, post-graduate medical residency

---

[1]The Court has since dismissed Count 7.  D. 40 at 2.  Partners has also represented to the Court that Dr. Shervin has agreed to dismiss Count 6.  D. 149 at 1.

[2]Partners and MGPO filed a joint motion for summary judgment.  <u>See</u> D. 149.

program.  D. 172 ¶¶ 1, 6; D. 229 ¶¶ 1, 6.  HCORP residents are taught at four Boston hospitals: Massachusetts General Hospital ("MGH"), Brigham and Women's Hospital ("Brigham"), the Children's Hospital of Boston and the Beth Israel Deaconess Medical Center ("Beth Israel").  D. 172 ¶ 6; D. 229 ¶ 6.  Each HCORP class has twelve residents.  D. 172 ¶ 9; D. 229 ¶ 9.

The HCORP Executive Committee ("the Executive Committee") is HCORP's governing body.  D. 172 ¶ 11; D. 229 ¶ 11.  It is comprised of the chiefs of each HCORP hospital's department of orthopaedic surgery as well as the HCORP Program Director.  Id.

Partners, a non-profit, charitable organization, is an integrated healthcare system that includes several hospitals, including MGH and Brigham, a physician network and other health-related entities.  D. 172 ¶ 2; D. 229 ¶ 2.  MGPO is a private corporation and it is undisputed that MGPO employs at least some MGH physicians.  D. 172 ¶ 3; D. 229 ¶ 3.

Dr. Herndon is a Professor of Orthopaedic Surgery at Harvard Medical School ("HMS") and served as the HCORP Program Director from 1998 to 2008.  D. 172 ¶ 4; D. 229 ¶ 4. The Program Director has at least some oversight over HCORP and the Program Director's responsibilities include overseeing and organizing residents' educational programs, including resident evaluations.  D. 172 ¶ 10; D. 229 ¶ 10.

Dr. Rubash remains the Chief of the Department of Orthopaedic Surgery at MGH and  a Professor of Orthopaedic Surgery at HMS.  D. 172 ¶ 5; D. 229 ¶ 5.  He also served on the Executive Committee.  D. 172 ¶ 12; D. 229 ¶ 12.

    **B.**    **Dr. Shervin's HCORP Residency and Probation**

        *1.*    *Dr. Herndon Imposes Probation on Dr. Shervin*

Dr. Shervin entered her HCORP residency in 2003.   D. 172 ¶ 14; D. 229 ¶ 14.   Dr. Shervin contends that she performed well at the beginning of her residency.[3] D. 217 ¶¶ 91–100, 132–138.  However, on January 30, 2007, while Dr. Shervin was in her fourth year of residency, Dr. Herndon met with Dr. Hari Parvataneni ("Dr. Parvataneni"), an arthroplasty fellow at MGH. D. 172 ¶ 16; D. 229 ¶ 16; Deposition of Dr. Herndon (D. 157-4 at 19).   The parties do not dispute that during that meeting, Dr. Parvataneni made complaints to Dr. Herndon about Dr. Shervin.  Id.

On February 2, 2007, Dr. Herndon and Dr. Shervin met.   D. 172 ¶ 18; D. 229 ¶ 18; D. 157-4 at 21.   At this meeting, Dr. Herndon informed Dr. Shervin that he was placing her on probation.  Id.  Dr. Shervin asserts that during the meeting, Dr. Herndon threatened her ability to complete HCORP and her post-graduate fellowship.   D. 172 ¶ 19; D. 229 ¶ 19; Deposition of Dr. Shervin (D. 157-1 at 63).   She further asserts that Dr. Herndon told her during the meeting that the effects of probation could affect her medical license, board certification, fellowship and employment opportunities.  Id.  Dr. Shervin also contends that Dr. Herndon did not allow her the opportunity during the meeting to address the allegations he raised.   D. 172 ¶ 21; D. 229 ¶ 21.

In a letter dated March 7, 2007, Dr. Herndon provided Dr. Shervin with written notice of her three-month probation.   D. 172 ¶ 22; D. 229 ¶ 22; Letter from Dr. Herndon (D. 157-11).   Dr. Herndon's letter cited as reasons for the probation her clinical performance, low exams scores, tardiness and negative feedback from other residents and fellows.   Id.

In March 2007, Dr. Shervin met with Dr. Rubash to express her concerns that Dr. Herndon's decision to place her on probation was fueled by gender discrimination.   D. 172 ¶ 27;

_____

[3]Dr. Shervin has presented an affidavit from Dr. Burke stating that he was very impressed with Dr. Shervin, whom he described as a "rising star."  D. 221-8 at 2.

D. 229 ¶ 27; D. 157-1 at 65.   Around the same time, Dr. Dennis Burke ("Dr. Burke"), an MGH

orthopaedic surgeon who worked with Dr. Shervin, D. 172 ¶ 13; D. 229 ¶ 13; Deposition of Dr.

Burke (D. 157-9 at 41), also expressed to Dr. Rubash that Dr. Shervin felt that she was placed on

probation because of gender bias.   D. 172 ¶ 30; D. 229 ¶ 30; Deposition of Dr. Rubash (D. 157-5

at 34).   Dr. Shervin alleges that during the meeting with Dr. Rubash, he discouraged her from

taking any legal action and questioned her regarding her desire to graduate.   D. 172 ¶ 40; D. 229

¶ 40; D. 157-1 at 65.

2.      <i>Dr. Shervin Requests Review of Probation Decision</i>

Each year of her residency, Dr. Shervin entered into a residency contract, titled "Graduate

Trainee Benefits and Responsibilities."   D. 153 ¶ 53; D. 230 ¶ 53; Deposition of Dr. Shervin (D.

153-20 at 8).   Each residency contract provides that a copy of the "Graduate Trainee Adverse

Action Process" and "Graduate Trainee Redress of Grievance" policies was to be attached to the

residency contract.  D. 153 ¶ 63; D. 230 ¶ 63; Dr. Shervin's Residency Contracts (D. 153-23; D.

153-24; D. 153-25).   On March 27, 2007, Dr. Shervin wrote to Dr. James Kasser ("Dr. Kasser"),

the Executive Committee Chairman, seeking an Executive Committee review of her probation

and citing the Partners Graduate Trainee Adverse Action Process as evidence that the proper

procedures were not followed in placing her on probation.   D. 172 ¶ 36; D. 229 ¶ 36; D. 153 ¶

94; D. 230 ¶ 94; March 27, 2007 Letter to Dr. Kasser (D. 157-15).   She also requested that the

probation be expunged from her records.   D. 172 ¶ 36; D. 229 ¶ 36; D. 157-15.   On April 6,

2007, Dr. Burke wrote to Dr. Kasser requesting that Dr. Shervin be afforded a fair hearing.  D.

172 ¶ 37; D. 229 ¶ 37; April 6, 2007 Letter from Dr. Burke to Dr. Kasser (D. 157-16).

The parties do not dispute that once the Executive Committee's investigation into Dr.

Shervin's probation began, Dr. Rubash discussed Dr. Shervin with other residents and fellows.

5

D. 172 ¶ 42; D. 229 ¶ 42; Dr. Rubash's Answers to Interrogatories (D. 157-17 at 5–6). Dr. Michael Fehm ("Dr. Fehm") has stated that he had one such discussion with Dr. Rubash. D. 172 ¶ 43; D. 229 ¶ 43; Deposition of Dr. Fehm (D. 157-18 at 9). Dr. Fehm stated that although Dr. Rubash expressed concern for Dr. Shervin, he also felt that toward the end of the discussion, Dr. Rubash attempted to elicit negative comments about Dr. Shervin. Id. Dr. Fehm said that he "saw this conversation as an effort to build armor against [Dr. Shervin]." Id.

On April 10, 2007, Dr. Herndon met with the Executive Committee regarding Dr. Shervin's probation. D. 172 ¶¶ 46–47; D. 229 ¶¶ 46–47; 157-4 at 27. Dr. Shervin also met with the Executive Committee in April 2007 and expressed her belief that she was being targeted and subjected to an atmosphere of retaliation. D. 172 ¶ 49; D. 229 ¶ 49; 157-1 at 67–68. Dr. Shervin asserts that in the spring and early summer of 2007, residents were being asked to find fault with her and that unfounded allegations were being raised against her. D. 172 ¶ 51; D. 229 ¶ 51; see D. 157-2 at 90–91.

Shortly after the Executive Committee meeting and, in April 2007, Dr. Shervin met with Dr. Ellice Lieberman ("Dr. Lieberman"), HMS's Dean for Faculty Affairs at the time, expressing her concerns about retaliation. D. 172 ¶ 50; D. 229 ¶ 50; D. 157-2 at 66–67. Dr. Shervin expressed to Dr. Lieberman that she felt she was being treated differently because she did not behave in ways in which women are stereotypically expected to behave and that she felt she was being punished for raising such concerns. Id.

On June 6, 2007, Dr. Kasser sent Dr. Shervin a letter informing her that the Executive Committee had decided that she would remain on probation. D. 172 ¶ 53; D. 229 ¶ 53; Letter from Dr. Kasser (D. 157-19). Shortly thereafter, on June 19, 2007, Dr. Herndon informed Dr. Shervin that her probation would be extended for three months. D. 172 ¶ 56; D. 229 ¶ 56; see D.

157-4 at 29–30.   On June 29, 2007, Dr. Herndon sent Dr. Shervin a letter providing written notice of her probation extension.  D. 172 ¶ 58; D. 229 ¶ 58; Letter from Dr. Herndon (D. 157-21).  In the letter, Dr. Herndon notified Dr. Shervin that he and Dr. Jo Shapiro ("Dr. Shapiro"), the Associate Director for Graduate Medical Education for Partners at the time, would meet with Dr. Shervin in September when Dr. Herndon returned from medical leave.  D. 172 ¶¶ 56, 58; D. 229 ¶¶ 56, 58; D. 157-21.

On June 29, 2007, Dr. Burke wrote a letter to Dr. Nancy Tarbell ("Dr. Tarbell"), Director of the Office for Women's Careers at MGH, stating that he thought Dr. Shervin was being treated unfairly.  D. 172 ¶ 60; D. 229 ¶ 60; Letter from Dr. Burke to Dr. Tarbell (D. 157-22).  Dr. Shervin met with Dr. Tarbell on July 2, 2007 and also wrote Dr. Tarbell a letter expressing that she believed that Dr. Herndon was retaliating against her for questioning his probation decision. D. 172 ¶ 61; D. 229 ¶ 61; Letter from Dr. Shervin to Dr. Tarbell (D. 157-23).

### 3.   Dr. Shervin's Probation Ends

During Dr. Herndon's medical leave during the summer of 2007, D. 172 ¶ 62; D. 229 ¶ 62; D. 157-4 at 16, Dr. Kasser was assigned to oversee Dr. Shervin's residency.  D. 172 ¶ 58; D. 229 ¶ 58; D. 157-21.   While on medical leave, Dr. Herndon received emails from two doctors reporting incidents concerning Dr. Shervin, one such incident being that Dr. Shervin was absent from an anatomy lecture.   D. 172 ¶¶ 63, 65; D. 229 ¶¶ 63, 65; email from Dr. Scott to Dr. Herndon (D. 157-28).  In late August 2007, Dr. Shervin wrote to Drs. Tarbell and Kasser stating that she felt Dr. Herndon was harassing and targeting her by trying to find fault with her performance.  D. 172 ¶¶ 67–68; D. 229 ¶¶ 67–68; August 27, 2007 Email from Dr. Shervin (D. 157-29).

During a meeting on September 6, 2007, the Executive Committee decided to end Dr. Shervin's probation.  D. 172 ¶ 71; D. 229 ¶ 71; Executive Committee Meeting Minutes (D. 157-31 at 3).  As of the end of Dr. Shervin's probation, and consistent with Dr. Shervin's request, Dr. Herndon was no longer Dr. Shervin's residency director and was replaced by Dr. Kasser.  D. 172 ¶¶ 74–75; D. 229 ¶¶ 74–75; D. 157-4 at 9–10.

> 4.   *Conclusion of Residency and Applying for a Medical Board License*

In or around March to April 2008, Dr. Shervin sought information from at least Drs. Weinstein and Shapiro of the Partners Graduate Medical Education Office ("GME") regarding the effect of her earlier probation on her application for a medical license.  D. 153 ¶ 112; D. 230 ¶ 112; April 7, 2008 email to Dr. Shervin (D. 153-40).  According to Dr. Shervin, Drs. Weinstein and Shapiro of the GME told Dr. Shervin that probation was not an adverse action that needed to be reported to the Board of Registration in Medicine.  D. 217 ¶ 327; April 7, 2008 email from Drs. Weinstein and Shapiro (D. 153-40 at 2); Deposition of Dr. Shapiro (D. 223-1).  Dr. Shervin contends that she submitted her application for a license on April 11, 2008, reporting that she had never received a disciplinary action.  D. 217 ¶ 333; Supplement Form to Board (D. 226-4).  On June 13, 2008, Dr. Shervin asserts, the Board informed Dr. Shervin that her prior probation was considered disciplinary action,  id. ¶ 337; Notice from Board (D. 226-7), and as a result, Dr. Shervin had to resubmit her application, causing a delay in her obtaining her medical license; as result of probation, Dr. Shervin was issued was a "limited license" that would require her to be monitored and/or supervised during her fellowship, unlike other fellows.  Id. ¶¶ 339–340, 344; Letter from Board (D. 226-16).

On June 20, 2008, residents, including Dr. Shervin, presented their theses.  D. 172 ¶ 88; D. 229 ¶ 88; Deposition of Dr. Sanaz Hariri (D. 157-37 at 9–10).  Some residents walked out of

the room during or prior to Dr. Shervin's thesis presentation.[4]  D. 172 ¶ 89; D. 229 ¶ 89; D. 157-37 at 9–10.   Dr. Shervin contends that Dr. Herndon and other members of the Executive Committee were aware this would occur and took no action to prevent it from happening.  D. 172 ¶¶ 351, 354–358; D. 229 ¶¶ 351, 354–358.

Dr. Shervin graduated from HCORP on June 30, 2008.  D. 172 ¶ 96; D. 229 ¶ 96.

### C.    Dr. Shervin's Post-Residency Fellowship and Commencement of Grievance and Legal Proceedings

Starting around August or September 2008, Dr. Shervin worked as a one-year fellow at MGH.  D. 172 ¶¶ 1, 98; D. 229 ¶¶ 1, 98; D. 157-1 at 46–47; Engagement Letter (D. 157-42). Around August 8, 2008, Dr. Shervin, through counsel, informed Partners that she planned to proceed with a grievance before the Partners Graduate Education Committee ("Partners Education Committee").  D. 172 ¶ 99; D. 229 ¶ 99; August 7, 2008 email from Paul Cirel to Joan Stoddard (D. 157-43).

On March 25, 2009, Dr. Shervin submitted a grievance statement through counsel, in which she alleged that Dr. Herndon's February 2007 probation decision "lacked any reasonable foundation in fact and was wholly deficient procedurally."  D. 172 ¶ 102; D. 229 ¶ 102; Grievance Statement (D. 157-46 at 2).  In the statement, she again raised her concern that Dr. Herndon had engaged in gender bias.  D. 157-46 at 7.  The statement also alleged that the Executive Committee extended her probation on "pretextual grounds."  Id. at 3.  The statement requested that "the decisions regarding probation be reversed and records relating to those decisions be expunged."  Id.  A Partners Education Committee Grievance Subcommittee ("the

---

[4] It is not entirely clear from the record who, if anyone, organized the "walkout."  There is at least some suggestion that this action may have been a response to Dr. Shervin's lack of courtesy to fellow residents during their respective thesis presentations.  D. 172 ¶ 89; Deposition of Dr. Coleen Sabatini, D. 157-38 at 7.

Grievance Subcommittee") was assembled to investigate and make a recommendation to the Partners Education Committee.  D. 172 ¶ 103; D. 229 ¶ 103, 111; D. 153 ¶ 125; D. 230 ¶ 125; Deposition of Dr. Jonathan Borus (D. 157-47).

On April 1, 2009, Partners and Dr. Shervin engaged a mediator to "attempt to resolve the disputes between them."  D. 172 ¶ 108; D. 229 ¶ 108; Letter from Mediator to MCAD (D. 157-54).  The same day, Dr. Shervin and Partners entered into a Tolling Agreement ("the Tolling Agreement") providing that were Dr. Shervin to file a complaint with the Massachusetts Commission Against Discrimination ("MCAD") by a certain agreed-upon date, her MCAD complaint would be treated as having been filed on April 1, 2009 for statute of limitations purposes.  D. 172 ¶ 109; D. 229 ¶ 109; Letter from Joan Stoddard to Ellen Zucker (D. 157-55).

Dr. Shervin completed her fellowship in the summer of 2009.  D. 172 ¶ 110; D. 229 ¶ 110; D. 157-1 at 46–47.  On October 14, 2009, the Grievance Subcommittee recommended that the Partners Education Committee affirm the initial probation decision by Dr. Herndon, the ratification of same by the Executive Committee and the extension of the initial probation for three months, Grievance Subcommittee Report (D. 157-48 at 4-11); the parties do not dispute that the Partners Education Committee adopted the subcommittee's recommendation.  D. 172 ¶ 111; D. 229 ¶ 111.

On October 26, 2009, Dr. Shervin filed a discrimination complaint with MCAD and the U.S. Equal Employment Opportunity Commission ("EEOC") against Partners, Harvard, Dr. Herndon and Dr. Rubash.  D. 172 ¶ 113; D. 229 ¶ 113; MCAD Complaint (D. 157-56).  Dr. Shervin filed her complaint in this Court on April 9, 2010.  D. 1.

     **D.**     <u>**Post-Fellowship Employment (2009-2010)**</u>

The parties do not dispute that in 2005, while Dr. Shervin was in the third year of her residency, she had discussions with Drs. Burke, Rubash and others concerning the possibility of a post-fellowship staff position at MGH, which would include privileges at Newton-Wellesley Hospital ("Newton-Wellesley").  D. 172 ¶¶ 119–120, 124; D. 229 ¶¶ 119–120, 124; D. 157-1 at 4; D. 157-5 at 12.  Upon Dr. Burke's suggestion, Dr. Shervin met with Dr. Rubash on November 30, 2005.  D. 157-12; see also D. 172 ¶¶ 132–133; D. 229 ¶¶ 132–133.  The parties do not dispute that Dr. Rubash recommended that Dr. Shervin meet with Dr. Andrew Freiberg ("Dr. Freiberg"), MGH's Chief of Arthroplasty service, to discuss fellowships.  D. 172 ¶ 136; D. 229 ¶ 136; D. 157-1 at 14–15.  Dr. Rubash also explained in the meeting the differences between academia and private practice.  D. 172 ¶ 138; D. 229 ¶ 138; D. 157-5 at 13–14.  Following the meeting, Dr. Rubash sent Dr. Burke an email stating that he was "very optimistic that we can do something for [Dr. Shervin] here."  D. 172 ¶ 150; D. 229 ¶ 150; November 30, 2005 email from Rubash to Dr. Burke (D. 157-64).

In December 2005, Dr. Shervin met with Dr. Freiberg and, according to Dr. Shervin, they discussed his recommendations for fellowships and "coming on staff" at MGH and Newton-Wellesley.  D. 172 ¶ 155; D. 229 ¶ 155; D. 157-1 at 12–13.  Although the parties do not dispute that there were conversations in and around 2005 about the possibility of a post-fellowship staff position at MGH for Dr. Shervin, the Defendants deny that any agreement or employment offer regarding the same was made.  See D. 229 ¶¶ 143–147.  Dr. Shervin contends that the Defendants later interfered with her purported hiring at Newton-Wellesley and MGH in the spring of 2009.  Dr. Shervin relies upon the fact that Dr. Rubash told a recommender that no staff positions were available, June 14, 2009 email from Dr. Rubash to Dr. Sunder (D. 227-14 at 2),

which she contends was pretext for a retaliatory withdrawal of her contemplated employment offer.  D. 229 ¶ 152.

### E.   Post-Complaint Employment Prospects

Dr. Shervin also contends that retaliation for her earlier complaints of gender discrimination continued after she initiated this lawsuit.  According to Dr. Shervin, she received an offer letter in or around the Spring 2012 from Cooley Dickinson Hospital ("Cooley"); see Draft Recruitment Letter (D. 228-2); D. 157-2 at 39.  Affidavit of Dr. Henry Drinker (D. 227-24 at 3).  At the time, Cooley was in negotiations with MGH about an affiliation.  There is evidence in the affidavit of Dr. Henry Drinker, Director of Joints Replacement Services at Cooley who recruited Dr. Shervin, that after the hospital had tendered her a contract and after contact between Cooley management and MGH management, the offer was withdrawn in or around late 2012.  Id. at 3–4.

Dr. Shervin also alleges that around June 2012, Dr. Mark Gebhardt, chief of the orthopaedic service at Beth Israel Deaconess Medical Center-Milton Hospital ("Milton"), not a party to this lawsuit, contributed to her being deprived of the opportunity to join the Beth-Israel Deaconess Physicians Organization.  D. 172 ¶ 183–185; D. 229 ¶ 183–185; D. 153 ¶ 142; D. 230 ¶ 142; Deposition of Dr. Joseph Morrissey (D. 228-6 at 11–12); D. 157-2 at 25–34, 44–45.

### III.   Procedural History

Dr. Shervin initiated this action on April 9, 2010.  D. 1.  Dr. Shervin filed an amended complaint on July 13, 2010, in which the present Defendants are named.  D. 38.  On June 14, 2010, Harvard moved to dismiss Dr. Shervin's state and federal discrimination and retaliation claims.  D. 10; D. 11.  On December 15, 2010, the Court allowed Harvard's motion to dismiss in

part, only as to Count 7, the c. 151C claim.  D. 40.  On June 30, 2010, Dr. Rubash moved to

dismiss the tortious interference claim, D. 31, which the Court denied.  D. 40.[5]

The parties have now engaged in extensive discovery, which has prompted numerous

discovery disputes by and between the parties and various third parties.  See D. 66; D. 71; D. 73;

D. 91; D. 97; D. 99; D. 112; D. 114; D. 125; D. 127; D. D. 169; D. 182; D. 214.  The Defendants

moved for summary judgment on November 22, 2013.  D. 144; D. 145; D. 148; D. 149.  After

extensive briefing and a hearing on February 6, 2014, the Court took these matters under

advisement.  D. 254.

## IV.   Standard of Review

### A.   <u>Summary Judgment</u>

The Court may grant summary judgment when there is no genuine dispute of material

fact and the moving party is entitled to judgment as a matter of law based on the undisputed

facts.  Fed. R. Civ. P. 56(a).  "An issue is genuine if the evidence of record permits a rational

factfinder to resolve it in favor of either party."  <u>Borges ex. rel. S.M.B.W. v. Serrano-Isern</u>, 605

F.3d 1, 4 (1st Cir. 2010) (citation and quotations omitted).  "A fact is material if its existence or

nonexistence has the potential to change the outcome of the suit."  <u>Id.</u> at 5.

Once the moving party meets its burden of showing that there are no genuine issues of

material fact, "the burden shifts to the nonmoving party, who must, with respect to each issue on

which she would bear the burden of proof at trial, demonstrate that a trier of fact could

reasonably resolve that issue in her favor," <u>Borges</u>, 605 F.3d at 5 (citation omitted), by

---

[5] The Court's order on the motions to dismiss also ruled that certain portions of the Defendants' motions were mooted by the filing of the amended complaint. D. 40.

presenting specific admissible facts.  Id.  "If the nonmovant fails to make this showing, then summary judgment is appropriate."  Id.

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The moving party "need only show that there is an absence of evidence in support of at least one element of [its] case in[] order to succeed on summary judgment."  Cellco P'ship v. Town of Grafton, Mass., 336 F. Supp. 2d 71, 82 (D. Mass. 2004).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in [her] favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are not sufficient to overcome summary judgment.  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (citation omitted).

### B.      Statement of Material Facts

The Defendants urge the Court to strike Dr. Shervin's statement of material facts, response to their statements of material facts and consolidated memorandum of law in opposition to their motions for summary judgment.  D. 236.  They contend that Dr. Shervin failed to comply with D. Mass. R. 56.1 and cite cases where courts have struck or otherwise rejected oppositions to summary judgment motions deemed noncompliant with this local rule for lack of conciseness and/or inclusion of immaterial statements of fact.  D. 237 at 7–8.

A party opposing a motion for summary judgment "shall include a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  D. Mass. R. 56.1.  The Court does not disagree that an excessive amount of ink has been expended on the pending

summary judgment motions and opposition to same.  Moreover, the Court does not disagree that many of the papers includes statements, arguments and suggestions that are not material to the issues of law that the Court must resolve in addressing the pending motions.  It is, however, not only Dr. Shervin's papers that suffer from this problem.  See, e.g., Dr. Rubash's Memorandum in Support of Summary Judgment, D. 144-1 at 3 n.3 ("In one of the most curious aspects of this case Dr. Burke provided Dr. Shervin with approximately $375,000 from his personal account").

For this reason, and, significantly because of the Court's reluctance to initiate yet another round of briefing, the Court declines to grant the motion to strike and accordingly, D. 236 is DENIED.  That having been said, the Court, however, has not relied upon any claims or facts that were not supported by specific references to the record or any alleged facts that were not material to deciding the Defendants' motions for summary judgment.  See Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass. 1997); Caban Hernandez v. Phillip Morris USA, Inc., 486 F.3d 1, 7–8 (1st Cir. 2007).

To the extent the Defendants argue that the Court should allow them an additional time to respond to Dr. Shervin's opposition papers, D. 237 at 9, the Court DENIES such request as moot as the Defendants have already filed responses, which the Court considered in deciding their motions for summary judgment.  See D. 243; D. 246; D. 247; D. 253.

## V.    Discussion

Dr. Shervin alleges gender discrimination in violation of Title VII against Partners, MGPO and Harvard, as well as gender discrimination in violation of c. 151B against all the Defendants.  D. 38.  Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex . . . "  42 U.S.C. §

2000e–2(a)(1). Likewise, Mass. Gen. Laws c. 151B, § 4(1) makes it unlawful "[f]or an employer . . . because of . . . sex . . . to . . . discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."  The statute also makes it unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter."  Mass. Gen. Laws c. 151B, § 4(4A).

To prove gender discrimination under either statute, Dr. Shervin must show that "she is a member of a protected group who has been denied an employment opportunity for which she was otherwise qualified." Dichner v. Liberty Travel, 141 F.3d 24, 29–30 (1st Cir. 1998).  "Such a showing gives rise to an inference that the employer discriminated due to the plaintiff's [protected status] and places upon the employer the burden of articulating "a legitimate, nondiscriminatory reason for the adverse employment decision." Id. at 30; see also Tate v. Dep't of Mental Health, 419 Mass. 356, 361 (1995) (applying the same burden-shifting standards for c. 151B discrimination claim).  This burden-shifting to the Defendants "entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the plaintiff's at all times. Dichner, 141 F.3d at 30.  If the Defendants meet such burden, Dr. Shervin must then prove that the Defendants' explanation is a pretext for unlawful discrimination.  Id.

Dr. Shervin further alleges retaliation in violation of Title VII against Partners and Harvard, as well as retaliation in violation of c. 151B, § 4(4) against all the Defendants.  D. 38. Title VII provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful

employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3.  Similarly, c. 151B, § 4(4) makes it unlawful "[f]or any person [or] employer . . . to . . . discriminate against any person because [s]he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five."  To prove *prima facie* retaliation, Dr. Shervin must show that she "engaged in protected conduct," "suffered an adverse employment action" and that the "adverse action was causally connected to the protected activity."  Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (citations and quotations omitted); Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004).  To show participation in a protected activity, Dr. Shervin need not prove that discrimination actually occurred, id. (citations and quotations omitted), but must show that she "reasonably and in good faith believed that the [defendant] was engaged in wrongful discrimination, that she acted reasonably in response to her belief, and that the [defendant's] desire to retaliate against her was a determinative factor in its decision to [engage in adverse action]."  Tate, 419 Mass. at 364.

Dr. Shervin also brings aiding and abetting claims against the Defendants, pursuant to Mass. Gen. L. c. 151B, § 4(5), which provides that it is unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."  As to these claims,  a defendant must still have "the requisite intent to discriminate [or retaliate] in order to be liable for aiding and abetting."  Beaupre v. Cliff Smith & Associates, 50 Mass. App. Ct. 480, 495 n.23, (2000).

All the Defendants seek summary judgment on the claims for gender discrimination and retaliation under both Title VII and c. 151B on the basis that there is no genuine dispute of

material fact that would foreclose the Court from granting summary judgment as to Dr. Shervin's timely claims.  Specifically, Dr. Rubash, Dr. Herndon, Partners and MGPO argue that because of the Tolling Agreement, all of Dr. Shervin's discrimination and retaliation claims that occurred prior to June 5, 2008 – 300 days before April 1, 2009 – are time-barred.  D. 144-1 at 10; D. 152 at 9; D. 150 at 2.  They further argue that there is insufficient timely evidence that they engaged in gender discrimination or retaliation, D. 144-1 at 16–19; D. 152 at 10; D. 150 at 8, and that Dr. Shervin has failed to present sufficient evidence of a tortious interference with a contract or advantageous business relationship.  D. 144-1 at 19; D. 152 at 19; D. 150 at 18.  Partners also argues that it qualifies for charitable immunity for the interference claim pursuant to Mass. Gen. L. c. 231, § 85K.  D. 150 at 19.

Harvard asserts that it was not party to the Tolling Agreement, and that therefore, the statute of limitations date for claims against Harvard is December 30, 2008 – 300 days prior to the filing of Dr. Shervin's MCAD complaint on October 26, 2009.  D. 151 at 28.  Like the other Defendants, Harvard argues that neither the "continuing violation" doctrine nor the so-called grievance exception to the statute of limitations applies.  D. 151 at 28.  Harvard also seeks summary judgment on all counts on the grounds that even in considering Dr. Shervin's timely claims, Harvard was not Dr. Shervin's employer, and therefore cannot be held liable under Title VII or c. 151B, and on the grounds that there is no evidence that Harvard possessed discriminatory animus, necessary for aiding and abetting discrimination or retaliation, since it is not the employer of Dr. Herndon or Dr. Rubash.  D. 151 at 1–2.

The Court will address each of the Defendants' arguments.

A.      <u>**The Grievance Exception Does Not Apply to Dr. Shervin's c. 151B Claims**</u>

The Court first addresses Dr. Shervin's argument that regardless of the Tolling Agreement, the statute of limitations does not apply to her c. 151B claims because of the so-called "grievance exception" to the statute of limitations.  The Court concludes that the grievance exception does not apply because Dr. Shervin did not invoke any grievance proceedings pursuant to a collective bargaining agreement.

Under c. 151B (as well as Title VII), a claim of unlawful discrimination or retaliation must be filed with MCAD within 300 days of alleged illegal conduct.  Mass. Gen. L. c. 151B, § 5; 42 U.S.C. § 2000e-5(1); <u>Ryan v. Holie Donut, Inc.</u>, 82 Mass. App. Ct. 633, 641 (2012). Massachusetts regulations provide, however:

> [The] 300 day requirement shall not be a bar to filing in those instances where . . . an aggrieved person enters into grievance proceedings concerning the alleged discriminatory act(s) within 300 days of the conduct complained of and subsequently files a complaint within 300 days of the outcome of such proceeding(s).

804 C.M.R. § 1.10(2); <u>see also</u> D. 231 at 64.

As Dr. Shervin notes in her papers in opposition to summary judgment, D. 231 at 64, the Massachusetts Supreme Judicial Court has "consistently granted deference to MCAD's decisions and policies" when interpreting c. 151B.  <u>Cuddyer v. Stop & Shop Supermarket Co.</u>, 434 Mass. 521, 534 (2001).  While the Court notes that  804 C.M.R. § 1.10(2) makes no explicit reference to collective bargaining agreements and only references "grievance proceedings," the MCAD has stated that it "has interpreted [the grievance] exception to apply only to formal grievance proceedings set forth in a collective bargaining agreement."  <u>Hall v. Fidelity Investments, Inc.</u>, No. 06-BEM-02514 (MCAD Aug. 24, 2007).  Deferring to MCAD's own interpretation of this regulation, the court in <u>Hall v. FMR Corp.</u>, 559 F. Supp. 2d 120, 125–26 (D. Mass. 2008),

adopted the MCAD's position, holding that the plaintiff in that case could not benefit from the grievance exception because she did "not allege that she was covered by a collective bargaining agreement or that she pursued a formal grievance under the terms of such an agreement."

While Dr. Shervin directs the Court to cases concerning the application of 804 C.M.R. § 1.10(2), none of them stand for the broad proposition that 804 C.M.R. § 1.10(2) applies to non-union-bargained grievance proceedings or that the MCAD has taken the position that it does. See Silvestris v. Tantasqua Reg'l Sch. Dist., 446 Mass. 756 (2006); Martins v. Univ. of Mass. Med. Sch., 75 Mass. App. Ct. 623 (2009); Leitao v. State Street Corp., 74 Mass. App. Ct. 1101 (2009). In first two cases where the grievance exception was analyzed, the plaintiff was either party to a collective bargaining agreement or a union agreement was otherwise at-play. See Silvestris, 446 Mass. at 764 (grievance procedure set forth in plaintiff's collective bargaining agreement); Martins, 75 Mass. App. Ct. at 628 (referencing the UMMS's grievance procedure) Pl.'s Br., Martins v. Univ. of Mass. Med. Sch., No. 08-P-1343, 2008 WL 5009146, at *3 (Mass. App. Ct. Oct. 17, 2008) (noting that while plaintiff "did not belong to Union, [he] was transferred with the terms and conditions of the Union employees").[6] Dr. Shervin has not cited other decisions in which a plaintiff who was not party to a collective bargaining agreement was permitted to use the grievance exception to the statute of limitations. That this exception is

---

[6]Addressing the cases cited in Dr. Shervin's surreply, the Court first notes that in Leitao, the court found that the plaintiff had not even entered into any grievance proceedings. 74 Mass. App. Ct., at *3. Dr. Shervin also relies upon Tunnell v. Smith College, No. 85-SEM-0081, 8 MDLR 1189 (MCAD 1986). See D. 263-1 at 14. Tunnell, however, does not save Dr. Shervin's argument where it turned on whether the complaint before the grievance committee needed to allege sex discrimination or only the same underlying facts to invoke the grievance exception. Id. at 5. The decision does not address, however, whether the proceeding was in the collective bargaining context. Moreover, to the extent that Dr. Shervin relies upon the case to suggest MCAD's position about the scope of the grievance exception, certainly the same is superseded by MCAD's later pronouncement about the collective bargaining requirement in Hall in 2007.

confined to grievance proceedings arising out of collective bargaining process, a process that "promo[tes] stability in collective bargaining relationships without impairing the free choice of employees," N.L.R.B. v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 794 (1990) (citation omitted), is consistent with the MCAD's position regarding application of the regulation (as noted above in Hall) and as reflected in other MCAD rulings. See, e.g., Randall v. Whittier Reg'l Vocational Technical High Sch., No 97-BEM-0497, 2002 WL 31318576, at *5, 9 (MCAD Aug. 28, 2002) (reflecting collective bargaining agreement in place and relying upon 804 C.M.R. § 1.10(2)).

For these reasons, the Court finds that the grievance exception articulated in 804 C.M.R. § 1.10(2) does not apply here, and therefore, the statute of limitations did not toll during the pendency of Dr. Shervin's grievance proceedings.

**B.      The Continuing Violations Doctrine Does Not Save Dr. Shervin's Time-Barred Claims**

*1.      Continuing Violation Doctrine Under Title VII*

Dr. Shervin also argues that another exception to the statute of limitations, the "continuing violation" doctrine, allows her to base the Defendants' liability for discrimination and retaliation on conduct that occurred outside the limitations period.

Under both Title VII and c. 151B, plaintiffs may rely on conduct that occurred when the conduct amounts to a "continuing violation."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); 804 C.M.R. § 1.10(2).  The United States Supreme Court clarified the reach of the Title VII continuing violation doctrine in Morgan, where the court held that while the continuing violation doctrine may provide an exception to the statute of limitations for claims which by "[t]heir very nature involve[] repeated conduct," id. at 114, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Id.

at 113.  "Discrete acts" include such acts as "termination, failure to promote, denial of transfer, or refusal to hire," id. at 114, and, accordingly, a plaintiff "can only file a charge to cover discrete acts that 'occurred' [i.e., the day that the discrete discriminatory or retaliatory act 'happened'] within the appropriate time period."  Id.  The Morgan court, in differentiating "hostile environment claims" from such discrete acts, held that a defendant may be liable for discriminatory or retaliatory conduct that falls outside of the limitations period when "all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Id. at 122.

> i.      "Anchoring Events" that Fall Within the Limitations Period

Dr. Shervin argues that four timely events "anchor" her claims (i.e., fall within the requisite time period), and, therefore, all of the allegedly discriminatory and retaliatory conduct, including conduct occurring before June 5, 2008, is actionable.  D. 231 at 67.  Although the nature and circumstances of these events are disputed by the Defendants, Dr. Shervin contends that there is specific, admissible evidence from which a reasonable jury could find that these events were discriminatory and/or retaliatory.  D. 231 at 67–68.  These events, occurring between June 5, 2008 and October 26, 2009, include:

> (1)      Dr. Shervin  asserts that Dr. Herndon aided and abetted the June 20, 2008 thesis presentation "walkout" by taking no action in response to residents walking out of the room during her thesis presentation.  D. 231 at 67; D. 217 ¶¶ 354–355.  While Dr. Shervin has not presented specific, admissible evidence that Dr. Herndon had prior knowledge that the walkout would occur,[7] Dr. Herndon testified at his deposition that

---

[7]Dr. Herndon testified at his deposition that he had no prior knowledge the walkout would occur.  D. 157-4 at 41–42.  The only evidence Dr. Shervin offers in support of her

although he was present when the residents walked out during Dr. Shervin's presentation, he did not respond to Dr. Shervin's concern or investigate the incident.  D. 157-4 at 41-42.

(2)   Dr. Shervin contends that Drs. Rubash and Herndon urged two residents to present unfounded complaints about Dr. Shervin, which they knew to be untrue, to the Executive Committee in July 2008.  D. 231 at 67.  Dr. Shervin has provided evidence that at an Executive Committee meeting on July 22, 2008, Dr. Brett Shore reported to the Committee that while on call, Dr. Shervin failed to respond to pages and that in other circumstances, Dr. Shervin improperly left cases for other residents to handle.  D. 217 ¶ 347 (citing Executive Committee Meeting Minutes from July 22, 2008, D. 226-17).  Dr. Shervin has also offered evidence that while Drs. Rubash and Herndon were both aware that Dr. Shervin had previously requested to be removed from the on-call schedule that weekend, D. 225-5,[8] the meeting minutes reflect that neither of them indicated such at the meeting of the Executive Committee.  D. 226-17.  While the meeting minutes do not reflect that Dr. Herndon was present at the meeting, Dr. Herndon also testified at his deposition that he urged Dr. Shore to come forward to talk to him about Dr. Shervin.  D. 219-4.

---

argument that Dr. Herndon knew the walkout would occur is inadmissible hearsay.  First, she offers a resident self-evaluation stating: "Recently, I heard rumors that many or some of my class would like to boycott graduation in response of the failure of the program to reprimand the student in question," referring to Dr. Shervin.  The resident continues: "Not going to graduation is an insult not only to each other, but to the attendings we know, love and respect."  D. 226-20.  Dr. Shervin also offers Dr. Burke's testimony that the "Executive Committee knew or should've known, about the walkout on Dr. Shervin and did nothing to stop it" and that if Dr. Kasser knew the walk out would occur, Dr. Herndon also must have known.  D. 219-20 at 37.

[8]D. 225-5 is an email from Dr. Rubash to Dr. Herndon asking to "seek an alternate solution" to Dr. Shervin being on call during graduation weekend.

(3)     Dr. Shervin posits that the Defendants interfered with her purported hiring at Newton-Wellesley and MGH in the spring of 2009.  While the question of whether Dr. Shervin was ever offered a staff position remains highly contested, see D. 229 ¶ 152, Dr. Shervin cites in support of her position that Dr. Rubash withdrew her job offer evidence that Dr. Rubash told a recommender that no staff positions were available.  June 14, 2009 email from Dr. Rubash to Dr. Sunder, D. 227-14 at 2 ("Thank you for your email regarding Dr. Nina Shervin.   At the moment, there are no positions open in the Orthopaedic Department for which we are hiring").

(4)     Dr. Shervin argues that the Grievance Committee's investigation in 2009 into her probation was conducted in an unfair manner.  She relies upon testimony of Dr. Borus, a member of the Grievance Subcommittee, who testified in a deposition that he did not know during the course of the Subcommittee's investigation that Dr. Shervin had alleged gender discrimination, D. 220-1 at 15, finding out about those allegations during the grievance hearing, which a jury could reasonably find means that the Subcommittee's process was not as searching as it should have been.  D. 220-1 at 24.  Dr. Borus also testified that he did not "have an understanding about how one demonstrates that actions are the product of impermissible gender bias."  D. 220-1 at 24.  Dr. Borus further testified that Dr. Shervin's counsel sent him an email on or around June 27, 2009 requesting that the subcommittee speak with Drs. Briggs and Hornicek as part of their investigation.  D. 220-1 at 74.  The Grievance Committee wrote in its Grievance Report, however, that "[n]either party responded to the Committee's request to submit a list of additional individuals for the Committee to interview."   D. 157-48 at 3.  Although Dr. Herndon cited a case involving a patient with a shoulder injury ("the shoulder case") in support of

his decision to impose probation, D. 220-1 at 57-58, Dr. Borus testified that Dr. Herndon never indicated to him that his description of events surrounding the shoulder dislocation patient in his March 7, 2007 probation letter to Dr. Shervin, was written in error.[9]  D. 220-1 at 57–58.  Dr. Borus testified that at the hearing, Dr. Herndon also stated that Dr. Shervin "didn't do the right thing with the shoulder."  D. 220-1 at 120.  Dr. Borus testified that the Committee never spoke to Dr. Holovacs and that the Committee did not receive the letter Dr. Holovacs wrote.  D. 220-1 at 121.

ii.    Probation was a Discrete Act

Even if the above conduct is in itself actionable, however, the Court concludes that Dr. Shervin cannot rely on these events to anchor a time-barred discriminatory or retaliatory acts to such timely acts as a continuing violation, where those time-barred acts, namely Dr. Herndon's February 2007 initial imposition of probation, the subsequent ratification of same by the Executive Committee the extension of that probation, were discrete acts.  As previously noted, the Morgan court held:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."

Id. at 114.  The First Circuit has since applied Morgan in a number of cases, focusing on whether the alleged discrimination or retaliation requires "repeated conduct to establish an actionable claim."  Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130–31 (1st Cir. 2009).  Here, the Court finds instructive the First Circuit's analysis in Miller v. New Hampshire Dep't of Corr., 296 F.3d

---

[9]On April 10, 2007, Dr. Holovacs, the attending surgeon, wrote an email to Dr. Kasser stating that he believed the only mistake Dr. Shervin made was failing to keep a hard copy x-ray after the operation; he did not believe, however, that this mistake rose "to the level of seriousness to which it seems to have risen."  D. 222-15; D 157 at 3.

18, 22 (1st Cir. 2002), a case decided after <u>Morgan</u>. There, the court rejected the plaintiff's argument that although he received a letter of warning and performance evaluation from his employer, he did not understand the "tangible effects" of the letter until three years later, when he was denied a promotion. <u>Id.</u> The court found that the continuing violation doctrine did not apply because the plaintiff understood the warning letter and evaluation – a discrete act – to be formal discipline, appealing such discipline through the internal review procedures. <u>Id.</u> In his appeal, the plaintiff stated that he felt "abused and retaliated against," demanding that the letter be removed from his file. <u>Id.</u> The court found that the plaintiff's "recognition [of the discriminatory and retaliatory nature of the disciplinary action taken against him] eliminate[d] any argument that the warning and evaluation did not have any crystallized implications or apparent tangible effects at the time they were issued." <u>Id.</u> (quotations omitted).

Dr. Shervin denounced the untimely discrete acts of discrimination and retaliation as such almost as soon as they occurred. In fact, the record in this regard is largely undisputed. Dr. Shervin, shortly after the February 2, 2007 meeting with Dr. Herndon, felt she was being treating disparately because of her gender. D. 172 ¶ 20; D. 229 ¶ 20; D. 157-2 at 88. As early as March 2007, Dr. Shervin told Dr. Rubash that she felt Dr. Herndon was treated her differently because of her gender. D. 229 ¶ 27; D. 157-1 at 65. Dr. Shervin claims that after she complained to Dr. Rubash, "reprisals began immediately." D. 229 ¶ 28. In fact, Dr. Shervin has asserted that the statements Dr. Rubash made to her during that meeting were retaliatory in nature. D. 229 ¶ 32. As did the plaintiff in <u>Miller</u>, Dr. Shervin expressed that she was "not being treated fairly" in the letter she addressed to Dr. Kasser dated March 27, 2007, in which she requested an Executive Committee review and expungement of her probation. Letter to Dr. Kasser (D. 157-15 at 2). In the letter, Dr. Shervin states her belief that "proper procedures were not followed" and that she

was "fully prepared to go forward with a full hearing on the merits."  Id.  She notes Dr.

Herndon's "inappropriate references" to her weight loss.  Id.  During her presentation to

Executive Committee on April 10, 2007, Dr. Shervin asserts that she told the Executive

Committee that she was concerned about gender bias.  D. 229 ¶ 54; 157-1 at 67–68.  Despite Dr.

Shervin's claims, the Executive Committee notified Dr. Shervin in June 2007 that it was

upholding Dr. Herndon's probation decision.  D. 229 ¶ 55; June 6, 2007 Letter from Dr. Kasser

(D. 157-19).  The letter stated that the Executive Committee felt that Dr. Herndon "made an

appropriate decision" based on Dr. Shervin's clinical and professional performance and did not

address gender bias.  D. 157-19.  After the Executive Committee's decision, Dr. Shervin

informed Dr. Lieberman that she suspected that new, unsubstantiated allegations about her

alteration of medical records may have surfaced because she had raised her concerns about

gender bias.  D. 229 ¶ 55.  As the Morgan court articulated, "related discrete acts" cannot be

converted into a "single unlawful practice for the purposes of timely filing."  Morgan, 536 U.S.

at 111.  The most that can said here is that the earlier discrete discriminatory acts related to the

later timely charged claims, but that does not aid Dr. Shervin since "discrete discriminatory acts

are not actionable if time barred, even when they are related to acts alleged in timely filed

charges."  Morgan, 536 U.S. at 113.  Accordingly, as much of Dr. Shervin's discrimination and

retaliation claims that occurred before June 5, 2008 (and before December 30, 2008 as to

Harvard for reasons stated below) is not actionable.

To the extent that Dr. Shervin contends that the Defendants' conduct rose to the level of a

"hostile work environment"—i.e., discriminatory conduct based on gender "sufficiently severe

or pervasive that it altered the conditions of [Dr. Shervin's] employment and created an abusive

working environment," where "the offending conduct was both objectively and subjectively

offensive," <u>Tuli v. Brigham & Women's Hospital</u>, 656 F.3d 33, 39 (1st Cir. 2011) (citations and quotations omitted), such contention does not aid Dr. Shervin on this record.  In hostile work environment cases, acts which may not be actionable on their own, occur over a period of time, eventually culminating into the plaintiff's realization that she has been subject to discrimination.  <u>Tuli</u>, 656 F.3d at 39–40, upon which Dr. Shervin relies, illustrates this paradigm.  In <u>Tuli</u>, over the course of over two years, a female neurosurgeon observed and endured sexual innuendo, sexually charged suggestions and degrading insinuations about her skills as a spine surgeon because she was a woman, many of them committed by her supervisor.  <u>Id.</u>  Although she complained internally about his behavior and it continued, it was not until after the supervisor's adverse presentation about her to the credentialing board that resulted in her qualified reappointment (affirmed, after review, by an internal committee) that she filed a MCAD complaint.  The <u>Tuli</u> court held that it was the "accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together" that constituted the hostile work environment, <u>id.</u> (quoting <u>O'Rourke v. City of Providence</u>, 235 F.3d 713, 729 (1st Cir. 2001)), and was the "classic example of a continuing violation" from the earlier 2005 to 2007 incidents to the 2007 adverse employment decision  <u>Id.</u>  at 40 (quoting <u>Tobin</u>, 553 F.3d at 130); <u>Johnson v. Univ. of Puerto Rico</u>, 714 F.3d 48, 53 (1st Cir. 2013) (noting that "[d]iscrete acts and hostile work environment claims are different in kind . . . because hostile work environment claims by their nature involve repeated conduct and a single act of harassment may not be actionable on its own").

Not so here.  Even drawing every reasonable inference in Dr. Shervin's favor to the extent that the material facts on this point are disputed, it remains the case that the untimely claims—the initial probation decision by Dr. Herndon, the failure to reverse such decision by Dr.

Herndon, Dr. Rubash or the Executive Committee, the extension of probation—were all discrete acts, all of which Dr. Shervin contemporaneously denounced as discriminatory and/or retaliatory and complained about to various of the Defendants as such. See D. 172 ¶ 27; D. 229 ¶ 27 (undisputed fact that in March 2007, Dr. Shervin met with Dr. Rubash to express her concerns that Dr. Herndon's decision to place her on probation was fueled by gender discrimination). That is, unlike the paradigm in which plaintiff suffers a number of indignities, the discriminatory animus of which is not clear until a series of such events continue over time or culminate in a discriminatory or retaliatory act for which the plaintiff then seeks relief, the opposite is true here. It is undisputed that Dr. Shervin complained about the probation (and the failure to reverse the decision or not allow its extension as discrimination) in 2007 and understood by June 6, 2007 that the Executive Committee would not provide her the relief she sought.  This is not a circumstance which, by virtue of the continuing violation doctrine, "victims of discrimination [are not penalized] for reporting misconduct as it occurs and attempting to work with their employers to remedy the situation."  Tuli, 656 F.3d at 41 (comparing the "Massachusetts' parallel analysis" under Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 541 (2001)). Nor is this case the paradigm in Tuli where "[a]lthough in 2005 and 2006, prior to the 300-day window, Tuli was subject to 'pinpricks,' . . . [her supervisor's] presentation to the [credentials] committee in October 2007 could be viewed as making clear that the situation was hopeless, triggering the clock for the sum of prior acts comprising the continuing violation."  Id.  The Court agrees with Dr. Shervin that Tuli is instructive, but it is instructive and distinguishable where she did not suffer "pinpricks," but a discrete punch in the form of the probation that, upon her contemporaneous complaints about it as gender bias, did not lead to the relief she sought, as in Miller, 296 F.3d at 22.

For all of these reasons, the Court finds that Dr. Shervin's claims do not fall under Title VII's continuing violation exception.

## 2. *Continuing Violation Doctrine Under c. 151B*

Similar to Title VII, Massachusetts law provides that "the 300 day requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature." 804 C.M.R. § 1.10(2); see Tuli, 656 F.3d (comparing the analysis under Morgan to the analysis under Massachusetts law). "[A] person [may] seek damages for alleged discrimination occurring outside the usual statute of limitations period if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the statute of limitations period to anchor the earlier claims." Pelletier v. Town of Somerset, 458 Mass. 504, 520 (2010) (citing Cuddyer, 434 Mass. at 541 (2001)).

Like the Title VII rule, Massachusetts's continuing violation doctrine "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Cuddyer, 434 Mass. at 531. Similarly, the doctrine applies to retaliation claims. Clifton v. Massachusetts Bay Transp. Auth., 445 Mass. 611, 616-17 (2005) ("Although unlawful retaliation, typically, may involve a discrete and identifiable [action], it may also consist of a continuing pattern of behavior that is, by its insidious nature, linked to the very acts that make up a claim of hostile work environment . . . . In sum, it is the nature of the unlawful conduct alleged by the plaintiff, independent of the precise formulation of his claim, that allows a plaintiff to invoke an exception to the limitations period for a continuing violation").

Cuddyer, decided in 2001, "decline[d] to adopt the Federal precedent [at the time]. . . with respect to the application of the continuing violation doctrine to claims of hostile work

environment sexual harassment under G.L. c. 151B." 434 Mass. at 521. Citing the First Circuit's decision in O'Rourke, 235 F.3d, the Supreme Judicial Court held that federal law "fail[ed] to recognize fully that an employee who suffers from recurring acts of abusive sexual verbal or physical conduct that, over time, rise to the level of a hostile work environment, may be unable to appreciate the true character and enormity of the discriminatory environment until after it has continued for an appreciable length of time." Cuddyer, 434 Mass. at 538. The court held that the continuing violation doctrine could therefore apply to c. 151B claims when "[i]ncidents of sexual harassment serious enough to create a work environment permeated by abuse typically accumulate over time, and many incidents in isolation may not be serious enough for complaint." Cuddyer, 434 Mass. at 532–33.

However, after the Supreme Court's decision in Morgan in 2002, the federal and state standards are closer to each other or at least co-extensive. See Clifton, 445 Mass. at 619 n.8 (citing Morgan for the conclusion that the "United States Supreme Court has agreed, in substance, with our reasoning in the Cuddyer case"). Since Morgan, in Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 441 Mass. 632 (2004), the Supreme Judicial Court articulated a three-part test: "a complainant must ordinarily prove that (1) at least one discriminatory act occurred within the six month limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts . . . and (3) earlier violations outside the six-month limitations period did not trigger [the plaintiff's] 'awareness and duty' to assert [her] rights, i.e., that [the plaintiff] could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory." Id. at 642–43 (citations and quotations omitted). In recognizing this standard, the court held that MCAD erred in finding that a new violation occurred each time an employer rejected the

plaintiff's same reasonable accommodation request, focusing, like the post-<u>Morgan</u> federal

courts, on whether a "discrete discriminatory act" triggered the statute of limitations:

> Looked at from another perspective, if the commission's "each day" theory is a viable way of identifying continuing acts of discrimination, nothing in principle distinguishes any discrete act of discrimination from a continuing violation. For example, the "act of discrimination" that occurs when an employer improperly denies an employee a promotion could be characterized as the refusal, every day after the denial, to give the employee the additional responsibilities and benefits that would have accompanied the promotion.  Similarly, a refusal to hire or a decision to terminate could also be recharacterized as unlawfully denying the employee a job "each day" thereafter.  This would eviscerate the purpose of a statutory limitations period, and permit what should be a limited exception to such a stricture to swallow it whole.  When an employer refuses an employee's request for a reasonable accommodation, the refusal is a discrete discriminatory act triggering the statutory limitations period.

<u>Id.</u> at 643–45.  The court in that case did, however, carve out an exception when an employer

takes equivocal action or inaction:  "when an employer responds to a request . . . with equivocal

action or inaction, the limitations period . . . begins to run at the point thereafter when the

employee knew or reasonably should have been aware that the employer was unlikely to afford

him [relief]."  <u>Id.</u> at 645.   Likewise, in <u>Clifton v. Massachusetts Bay Transp. Auth.</u>, 445 Mass.

611 (2005), the court again emphasized the plaintiff's "pervasively hostile" work environment.

<u>Id.</u> at 621.  The court noted that "[a] hostile work environment may be manifested by a series of

harassing acts that have been described as "pinpricks [that] only slowly add up to a wound. . . .

One pinprick may not be actionable in itself, and its abusive nature may not be apparent except

in retrospect, until the pain becomes intolerable."  <u>Id.</u> at 617 n.5; <u>see</u> <u>Butler v. Wellington Mgmt.</u>

<u>Co., LLP</u>, 79 Mass. App. Ct. 1126, 2011 WL 2463446, at *3 (2011) (unpublished) (citing

<u>Morgan</u>, found that "continuing violations are 'different in kind from discrete acts.  Their very

nature involve repeated conduct'" and quoting <u>Morrison v. Northern Essex Community College</u>,

56 Mass. App. Ct. 784, 794 (2002)).   That is, even under state law, this doctrine concerns the

hostile work environment claims, <u>see</u> <u>Pelletier</u>, 458 Mass. at 523–24 (workplace "pervaded by

harassment or abuse . . . and that the resulting intimidation, humiliation, and stigmatization posed a formidable barrier to [her] full participation in the workplace"), and not discrete acts, to which later acts may be related but are not continuing violations.

The general rule is and, "[b]y the plain language of the statute, the limitations period begins to run at the time of the 'act of discrimination.'" Ocean Spray Cranberries, Inc., 441 Mass. at 265; Mass. Gen. L. c. 151B, §5. As with Supreme Court's recognition in Morgan of the distinction between discrete acts and continuing violations, the Supreme Judicial Court distinguished between acts for which the precise moment of the act of discrimination "is easy to calculate: plainly, if an employee is denied a promotion on an improper basis, the date of the 'act of discrimination' is the date of that denial" and those instances in which "improper conduct continues or evolves over a course of time, the date of the 'act of discrimination' is more difficult to determine" and for which the MCAD has adopted the 'continuing violations' exception to the statute of limitations." Ocean Spray Cranberries, Inc., 441 Mass. at 641-42 & n. 12 (citing application MCAD regulation, now 804 C.M.R. § 1.10(2)); see Pelletier, 458 Mass. at 520 (citing Cuddyer and noting that "[c]hapter 151B discrimination complaints must be brought within these prescribed periods, but where alleged misconduct forms a pattern of behavior, the continuing violation doctrine applies"). That is, the continuing violation doctrine under Massachusetts law no more aids Dr. Shervin here than it did under federal law for the reasons discussed above. Accordingly, the Court cannot find that the continuing violation doctrine applies to Dr. Shervin's c. 151B claims for the reasons discussed above in regard to the Title VII analysis. Rather, the probation-related decisions were discrete acts of which Dr. Shervin denounced as discriminatory and/or retaliatory and for which she did not contemporaneously receive the relief she sought. See Ocean Spray Cranberries, Inc., 441 Mass. at 646-47

(concluding that claim regarding the employer's failure to make reasonable accommodation was time-barred where "there is no basis in the record to support the conclusion that [the claimant] did not know or should not have been reasonably aware that his request was not going to be accommodated").[10]

Therefore, the Court finds that Dr. Shervin cannot benefit from the continuing violation doctrine for liability for her c. 151B claims.

> 3.   *The Operative Limitations Date for Harvard is December 30, 2008 and June 5, 2008 for the Remaining Defendants*

In light of the Court's ruling about the statute of limitations,[11] the Court turns to assessing the appropriate operative statute of limitations dates.

The parties do not dispute that Dr. Shervin and Partners entered into a Tolling Agreement on April 1, 2009 stating that "any discrimination or retaliation claims filed by Dr. Shervin on or before October 26, 2009 shall be treated as having been filed on April 1, 2009 for statute of

---

[10]Since Dr. Shervin has not met the continuing violation standard, she is not entitled to a Cuddyer instruction, but, she may still be able to introduce time-barred events at trial, even if she cannot recover damages for them.  Pelletier, 458 Mass. at 521 & n.33.  That is, while the Defendants may not be found liable for conduct outside the limitations period, a jury may still be permitted to consider untimely "background evidence" in assessing the viability of the actionable discrimination and retaliation claims.  O'Rourke, 235 F.3d at 726; Clifton, 445 Mass. at 613.

[11]Dr. Shervin also argues that equitable principles militate in favor of tolling the statute of limitations on the c. 151B claims because a jury could find that the Defendants engaged in discriminatory and retaliatory behavior to "try and wait out the clock."  D. 231 at 71. Equitable tolling, however, is applied "sparingly in employment discrimination cases" and is used "[w]here an employer affirmatively misleads an employee, or encourages or cajoles her into inaction." Cole v. Mount Ida Coll., 71 Mass. App. Ct. 1121 (2008) (citations and quotations omitted).  The Supreme Judicial Court has further held that equitable tolling applies only when "the prospective plaintiff did not have, and could not have had with due diligence, the information essential to bringing suit."  Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 63 (1997).  As discussed throughout this decision, the Executive Committee informed Dr. Shervin shortly after she asked for review that it was affirming Dr. Herndon's probation even though Dr. Shervin expressed from the beginning that the probation was a result of gender bias.  See D. 229 ¶¶ 53, 56.  A couple of weeks later, in fact, her probation was extended.  D. 229 ¶ 56.

limitations purposes." D. 217 ¶ 413. The Tolling Agreement, the existence of which the parties do not dispute, provides that "in a dispute between Dr. Nina Shervin and Partners HealthCare System, Inc., its representatives, agents, successors, assigns, affiliates, parents, officers, partners, employees and insurers . . . the parties entered into a tolling agreement to attempt to resolve the disputes between them . . . ." D. 153-46 at 2. Therefore, consistent with the Court's rulings above, in determining any liability on the part of Partners, MGPO, Dr. Rubash or Dr. Herndon, the jury will be permitted to consider events occurring after June 5, 2008, which is 300 days before April 1, 2009.

The Court cannot find, however, that Harvard was party to the Tolling Agreement. While Dr. Shervin argues that Harvard was involved in "on-going efforts to resolve this matter" in the spring of 2009, D. 217 ¶ 415, by the face of the agreement itself, Harvard is not a party. While, as Dr. Shervin argues, the agreement binds Partners' "affiliates," Harvard is correct in asserting that it cannot be bound by a tolling agreement that it did not give Partners the legal authority to which to bind it. See Williams v. Ely, 423 Mass. 467, 479-80 (1996). In an affidavit, Joan Stoddard, counsel for Partners, stated that she signed the Tolling Agreement on behalf of Partners and that Harvard did not authorize her to sign the Tolling Agreement on its behalf. D. 153-47 ¶¶ 8, 10–11. She further attests that she did not intend to bind Harvard and did not tell Dr. Shervin's counsel or otherwise suggest to her that she had the authority to bind Harvard. Id. ¶¶ 12–13. Dr. Shervin has offered no specific, admissible evidence on this record supporting the contention that Harvard gave Partners the authority to bind it to the Tolling Agreement. Therefore, the controlling date for statute of limitations purposes for claims against Harvard is December 30, 2008 – 300 days before Dr. Shervin filed her MCAD complaint on October 26, 2009. D. 1.

**C.      The Court Denies Summary Judgment as to the Timely Gender
         Discrimination and Retaliation Claims**

    *1.       Claims Against Dr. Rubash*

        i.       Discrimination

As noted above, to prove gender discrimination Dr. Shervin must show that "she is a
member of a protected group who has been denied an employment opportunity for which she
was otherwise qualified." <u>Dichner</u>, 141 F.3d at 29–30.   "Such a showing gives rise to an
inference that the employer discriminated due to plaintiff's [protected status] and places upon the
employer the burden of articulating a "legitimate, nondiscriminatory reason for the adverse
employment decision." <u>Id.</u>; <u>see also</u> <u>Tate v. Dep't of Mental Health</u>, 419 Mass. 356, 361 (1995)
(applying same burden-shifting standards for c. 151B discrimination claim).   "This entails only a
burden of production, not a burden of persuasion; the task of proving discrimination remains the
plaintiff's at all times." <u>Dichner</u>, 141 F.3d at 30.   If the Defendants meet such burden, Dr.
Shervin must then prove that the Defendants' "explanation is a pretext for unlawful
discrimination." <u>Id.</u> Dr. Rubash argues that Dr. Shervin cannot make a *prima facie* showing that
he engaged in gender discrimination.  D. 144-1 at 16–17.  The Court disagrees.  As discussed
above, Dr. Shervin has at least provided admissible evidence suggesting that Dr. Rubash may
have foreclosed an employment opportunity at Newton-Wellesley and MGH in the spring of
2009—citing, in support of her argument that Dr. Rubash withdrew her job offer—evidence that
Dr. Rubash told a recommender that no staff positions were available.  D. 227-14 at 2.

    Dr. Rubash also argues that there is no evidence "to substantiate that [Dr. Shervin's]
status as a woman had any bearing on Dr. Rubash's actions in the aftermath of the probation."
D. 144-1 at 17.  However, the Court cannot conclude on the record that a reasonable jury could

not surmise from the sequence of the events above that Dr. Rubash had a discriminatory animus, where Dr. Shervin contends that at least a contemplated offer of employment was later made not available to her.

ii.     Retaliation

To prove *prima facie* retaliation, Dr. Shervin must show that she "engaged in protected conduct," "suffered an adverse employment action" and that the "adverse action was causally connected to the protected activity."  Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (citations and quotations omitted); Mole v. University of Massachusetts, 442 Mass. 582, 591–92 (2004).   To show participation in a protected activity, Dr. Shervin need not prove that discrimination actually occurred,  id. (citations and quotations omitted), but must show that she "reasonably and in good faith believed that the [defendant] was engaged in wrongful discrimination, that she acted reasonably in response to her belief, and that the [defendant's] desire to retaliate against her was a determinative factor in its decision to [engage in adverse action]."  Tate, 419 Mass. at 364.

Dr. Rubash argues that Dr. Shervin has failed to present evidence that he retaliated against her because she cannot prove that any adverse action taken against her was causally connected to any protected conduct. D. 144-1 at 18.  The parties do not dispute that Dr. Shervin engaged in a protected activity in disputing her probation and a jury could find that Dr. Rubash's alleged role at least in foreclosing a staff position at Newton Wellesley and MGH in 2009 was causally connected to her protected conduct.[12]  Hotly disputed in this case is whether it was ever suggested that Dr. Shervin would be given a staff position at Newton-Wellesley.  Dr. Shervin

---

[12]To extent that Dr. Rubash challenges the aiding and abetting claim, Dr. Shervin's claims that Dr. Rubash's failure to act on Dr. Herndon's actions also  support this claim.

contends that both she and Dr. Burke were under the impression that Dr. Shervin had been offered a post-fellowship staff position.  D. 229 ¶ 157 (citing D. 157-9 at 47–48).  A jury could find that if any such job offer did exist, Dr. Rubash ensured that the purported opportunity she had to work at Newton-Wellesley was not available because Dr. Shervin chose to pursue her claims and make allegations of discrimination against various people, including him.

### 2.    *Claims Against Dr. Herndon*

Dr. Herndon likewise argues that there is "no factual basis for any claim that Dr. Herndon engaged in discriminatory or retaliatory conduct after June 5, 2008."  D. 152 at 16.

### i.    Discrimination

A jury could find that Dr. Herndon's alleged post-June 5, 2008 efforts to have the Grievance Committee affirm an allegedly improper disciplinary action against Dr. Shervin reflected discriminatory animus and/or retaliation.   For instance, Dr. Shervin has provided evidence that during the Grievance Committee's 2009 hearing, Dr. Herndon stated that Dr. Shervin "didn't do the right thing with the shoulder," referring to the shoulder case,  D. 220-1 at 120, even though the Executive Committee had been informed, by a letter to Dr. Kasser from the attending surgeon, that Dr. Shervin's mistake did not rise "to the level of seriousness to which it seems to have risen."  D. 222-15.

### ii.    Retaliation

"Prohibited retaliatory actions are those that constitute a change in working conditions that 'create a material disadvantage in the plaintiff's employment.'"  Ritchie v. Dep't Of State Police, 60 Mass. App. Ct. 655, 665 (2004) (quoting Flanagan–Uusitalo v. D.T. Indus., Inc., 190 F. Supp. 2d 105, 116 (D. Mass. 2001)).   As discussed above, Dr. Shervin has provided admissible evidence that Dr. Herndon contributed to the allegedly faulty Grievance Committee

investigation by failing to notify the Grievance Subcommittee at least as to the potentially overstated description of events surrounding the shoulder case. A jury could find, at the least, that Dr. Herndon took this action as retaliation for Dr. Shervin's decision to dispute his probation decision.

The Court finds that Dr. Shervin has presented sufficient evidence suggesting that there exists a material question of fact as to whether Drs. Rubash and Herndon engaged in discriminatory and/or retaliatory conduct.

### 3.   Retaliation Claim Against Partners and MGPO

The Court notes that Partners does not dispute that Dr. Rubash and Dr. Herndon were employees of Partners, making Partners liable for the actions they took in the scope of their employment. See D. 172 ¶¶ 2–5; see also Dias, 438 Mass. at 322. Partners nonetheless argues that Dr. Shervin's retaliation claims are not legally cognizable because she had no reasonable and good faith belief that Dr. Herndon placed her on probation out of gender bias, D. 150 at 8, and "has adduced no evidence to challenge Dr. Herndon's proffered non-discriminatory reason for imposing probation." D. 150 at 11.

The Court cannot so conclude on this record. Even though the pre-June 5, 2008 conduct may not be the basis of liability under Title VII and c. 151B for the reasons previously stated, the circumstances surrounding the 2007 probation do bear upon, and will be admissible at trial, as to the question of whether Dr. Shervin reasonably and in good faith believed that the Defendants were engaged in discrimination as to her timely retaliatory claims based upon the Defendants' post-June 5, 2008 allegedly retaliatory claims. Accordingly, the Court notes that Dr. Shervin testified during her deposition that Dr. Herndon "made comments about the fact that I did not behave in the way that women behave when they are disciplined by him." D. 157-1 at 63-64.

She has also submitted admissible evidence that Dr. Herndon said that he "had never disciplined a wom[a]n resident who didn't cry and [Dr. Shervin] didn't cry."  Deposition of Dr. Burke, D. 221-8 at 4;  see Lipchitz v. Raytheon Co., 434 Mass. 493, 503 (2001) ("Employment decisions that are made because of stereotypical thinking about a protected characteristic or members of a protected class, whether conscious or unconscious, are actionable under G.L. c. 151B").  Dr. Shervin has also provided evidence suggesting that when male residents faced problems, they were not immediately placed on probation.  See D. 217 ¶ 200–203.  For instance, Dr. Manish Sethi testified during his deposition that when his clinical ability and knowledge were brought into question by an attending surgeon, he was "asked to demonstrate [his] clinical ability and knowledge in different settings, which [he] did successfully."  D. 220-10 at 12; see Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 17 (1998) (finding that deviation for standard procedures could support a reasonable inference of discrimination).  That is, on this record, a reasonable jury could find that, at a minimum, Dr. Shervin had a reasonable and good faith basis for believing that the probationary decision was discriminatory for the purposes of her timely retaliatory claims.[13]

In light of the present record, a jury could find that Dr. Shervin reasonably believed that Dr. Herndon engaged in retaliatory conduct, not time-barred, in response to her earlier complaints about her probation being based on gender bias.  As discussed above in regard to Dr. Rubash, the Court also finds that Dr. Shervin has shown that, when looking at the facts in the

---

[13]Dr. Shervin also offers Dr. Burke's deposition testimony, where he stated that Dr. Hornicek told him that Dr. Herndon told Dr. Hornicek that he extended probation because Dr. Shervin challenged his decision to place her on probation.  D. 217 ¶ 266 (citing D. 219-20 at 35).  The cited deposition testimony does not indicate when this conversation took place, and Dr. Shervin does not, in any event, demonstrate to the Court why this statement would not be considered inadmissible hearsay.

light most favorable to Dr. Shervin, there is a genuine issue of material fact as to whether the non-time barred actions Dr. Rubash took in response to Dr. Shervin's complaints about probation were retaliatory.

### D. The Court Cannot Find on this Record that the Conduct of Drs. Rubash and Herndon Is Not Also Attributable to Harvard

Both Harvard and Dr. Shervin expend significant briefing on who was employed by Harvard.  Dr. Shervin argues that the actions of faculty members, including Drs. Herndon and Rubash, were taken on Harvard's behalf, making Harvard liable for the actions of these individuals and also argues that Harvard was her employer for the purposes of Title VII and c. 151B § 4(4).

Harvard counters that the "notion that HCORP faculty members were agents of HMS when conducting HCORP functions flies in the face of the evidence in this case," D. 151 at 20, and cites Chapin v. Univ. of Mass. at Lowell, 977 F. Supp. 72, 80 (D. Mass. 1997) for the proposition that "a charging party must show that the alleged defendant supervised or controlled the conduct of the person who was alleged to have committed the unlawful act." D. 151 at 23. The parties do not dispute that if the faculty members were acting within the scope of any employment relationship, the institutional defendants would be liable for the faculty members' conduct.  See Dias v. Brigham Med. Associates, Inc., 438 Mass. 317, 322 (2002) (stating that under "traditional agency law . . . an employer is liable for torts committed by employees acting in the scope of their employment") (citations, quotations and alterations omitted); Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 163 (1st Cir. 1995) ("A joint employer relationship exists where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment").

The First Circuit has "construed Supreme Court decisions as establishing the proposition that the terms 'employer' and 'employee' under Title VII are to be defined with reference to [ ] common law agency principles." DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 4 (1st Cir. 2011) (quoting Lopez v. Massachusetts, 588 F.3d 69, 83 (1st Cir. 2009) (quotations omitted)).  Under federal law, "the common-law element of control [by the putative employer over the putative employee] is the principal guidepost that should be followed." DeLia, 656 F.3d at 4 (citation and quotations omitted).  "Similarly . . . Massachusetts cases have determined that an employer can be defined as one "'who has direction and control of the employee and to whom . . . [the employee] owe[s] obedience in respect of the performance of his work.'" Id. (quoting Fleming v. Shaheen Bros., Inc., 71 Mass. App. Ct. 223 (2008)); see Wheatley v. Am. Tel. & Tel. Co., 418 Mass. 394, 397 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B").  While the First Circuit has set forth a number of factors for courts to consider, see Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica, 361 F.3d 1, 7 (1st Cir. 2004) (citation and quotations omitted), "[t]he test provides no shorthand formula or magic phrase that can be applied to find the answer[] . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Id. (citation and quotations omitted).  "A court must tailor these factors to the relationship at issue.  Often certain factors will not be relevant to a particular case, and a court should not consider them as favoring either side." Id. at 7 n.7.  "However, in most situations, the extent to which the hiring party controls the manner and means by which the worker completes her tasks will be the most important factor in the analysis." Id. at 7 (citation and quotations omitted).  Therefore, while "a court may decide the employee/independent contractor question as

a matter of law," it may only do so when "the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion."  Id.

The Court agrees with Harvard that most of the evidence Dr. Shervin offers does not assist the Court in determining whether there is a disputed question of material fact as to whether Harvard controlled the day-to-day activities of the faculty members on staff at the hospital, or the day-to-day activities of residents.  The Court also agrees that Dr. Shervin has, at a minimum, overstated the relevance of some of the evidence she cites.  For instance, while Dr. Shervin provides evidence that the Residency Director is approved by the Harvard dean, see D. 217 ¶ 36, there is still no evidence cited from this record that after such appointment, Harvard has any control over the Residency Director's activities.  While the Affiliation Agreement Harvard has with its affiliated hospitals states that research experts working in the hospitals are responsible for instruction of medical students, as they "share the responsibility for all the duties and objectives of these departments as defined by the Medical School and the Hospital," D. 219-5 at 9, Dr. Shervin has directed the Court to no evidence on this record suggesting that this provision actually applies to any of the doctors accused of acting unlawfully in this case.

Still, the Court cannot find that on this record that the "factors point so favorably" to Harvard such that a jury could not find that the faculty members working at the hospitals were not under Harvard's day-to-day control.  For one example, the former president and CEO of Beth-Israel suggested in an affidavit that Harvard and its affiliated hospitals are "closely intertwined," such that Harvard may inform the hospitals' compensation decisions, promotion criteria, faculty standards and removal rules and procedures.  Affidavit of Paul Levy (D. 219-11).  Also, Harvard's own policies state that the university takes "institutional responsibility" for any activity for which the Harvard name is used.  Harvard Policy on Use of Harvard Names and

Insignias (D. 220-4 at 2) ("the activity must be one for which the University takes institutional responsibility"). Given facts such as these, a jury could determine that Harvard's control over the doctors' everyday functions was pervasive enough such that Harvard should also be considered their employer, in addition to Partners.

If a jury finds that the faculty members were employed by Harvard and acting under the scope of that employment,[14] then it will be necessary to determine whether Harvard was Dr. Shervin's employer, as only a plaintiff's employer may be held liable for discrimination and retaliation under both Title VII and c. 151B. Likewise, the Court cannot say on this record that Harvard was not Dr. Shervin's employer.[15] On this point, the Court notes that Dr. Shervin has set forth evidence that a resident may be subject to adverse action that could lead to termination from HCORP if she violates Harvard Medical School bylaws, policies or procedures. D. 220-7

---

[14]Harvard further argues that Dr. Shervin cannot show that it aided and abetted any discriminatory or retaliatory conduct pursuant to c. 151B, § 4(5) because Harvard had no intent to discriminate or retaliate against her and there is no evidence that Harvard committed any wrongful acts not attributable to Partners. D. 151 at 22. As discussed above, the Court cannot find, as a matter of summary judgment, that Harvard was not responsible for the actions taken by Drs. Rubash and Herndon.

[15]Harvard is correct in asserting that the Court, on a motion to compel, has previously stated that "[a]s HMS was not Shervin's employer, HMS has indicated in its opposition that it does not maintain personnel records (and is not required to do so since it was not an "employer" [] under c. 149, § 52C) for Shervin or the other HCORP residents." D. 246 at 4 (citing D. 162). That prior statement does not foreclose the decision that the Court makes here. In deciding the motion to compel, the Court utilized a statutory definition of "employer" for the specific purpose of determining whether Dr. Shervin was entitled to personnel records. See Mass. Gen. L. c. 149, § 52C (""Personnel record[,"] a record kept by an employer that identifies an employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation or disciplinary action"). The Court makes its ruling here on a fuller record and under the legal standards articulated above.

at 2.   A jury could well find that this type of disciplinary policy could affect the day-to-day practices of a resident.[16]

The Court recognizes the abundance of evidence Harvard has presented that could very well lead a jury to find that Harvard did not control any of the day-to-day actions of any of the doctors in this case.   However, given that "[w]hether joint employer status exists is essentially a factual question," Rivera-Vega, 70 F.3d at 163, the Court finds that at the least, Dr. Rubash's 2009 actions, if attributable to Harvard, regarding the purported Newton-Wellesley job offer could form a timely basis for liability against Harvard, taking into account that Dr. Shervin must show that Harvard engaged in discriminatory or retaliatory conduct after December 30, 2008.

### E.   The Court Denies the Defendants' Motions for Summary Judgment as to the Tortious Interference Claims

#### 1.   As to Dr. Rubash, There are Material Factual Disputes as to the Existence of a Contemplated Contract

Dr. Rubash argues that Dr. Shervin has not presented any evidence that he tortiously interfered with an advantageous business relationship or contemplated contract.   D. 144-1 at 19. To show tortious interference with advantageous business relations, Dr. Shervin must prove: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) [Dr. Shervin's] loss of advantage directly resulting from the defendant's

---

[16]The Court takes note of Harvard's reliance on Loewen v. Grand Rapids Med. Educ. Partners, No. 1:10-CV-1284, 2012 WL 1190145 (W.D. Mich. Apr. 9, 2012) (holding that the medical school was not the medical resident's joint employer for Title VII and state law discrimination claim purposes) for the proposition that a medical resident is not employed by a medical school for Title VII purposes.   D. 151 at 14.   Still, based on the standards articulated by the First Circuit and Massachusetts courts discussed above, the Court finds that Loewen, while persuasive to some extent, is not controlling.

conduct." Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F. 2d 33, 36 (1st Cir. 1992)

(citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990)).

Dr. Rubash argues that he could not interfere with any business relationship in regard to

Dr. Shervin's purported position with MGH because "she never had a contract with this

institution or its professional organization for an attending position."  D 144-1 at 20.  While Dr.

Shervin's opposition does not address these arguments (she argues only that "Dr. Rubash surely

interfered with Dr. Shervin's ability to be hired at the Newton-Wellesley"), D. 231 at 78, the

Court finds that the record provides sufficient admissible evidence such that a jury could find

that there was at least a contemplated contract of future employment with MGH/Newton-

Wellesley.  As discussed above, Dr. Shervin asserts that at the beginning of her third year of

residency, Dr. Burke suggested to Dr. Rubash that Dr. Shervin be brought onto the MGH and

Newton-Wellesley staffs as an attending physician, employed full-time by MGPO.  D. 217 ¶

109-110, 112, 117.  The parties do not dispute that Dr. Rubash met with Dr. Shervin in

November 2005 to discuss Dr. Shervin's potential post-fellowship employment at MGH and

Newton-Wellesley.  Where the parties disagree, however, is as to the nature of the conversation –

while Dr. Rubash claims that he never offered Dr. Shervin employment, Dr. Shervin has

presented evidence that Dr. Rubash orally assured Dr. Burke of a "firm job offer."  D. 217 ¶ 115;

D. 229 ¶ 157 (citing D. 157-9 at 47–48).[17]

---

[17]Dr. Rubash has argued that even if he or any of the Defendants had made an oral agreement promising Dr. Shervin a position with MGH, the statute of frauds prevents any such oral agreement from being enforced. D. 144-1 at 15.  While the Supreme Judicial Court has held that the statute of frauds bars enforcement of any oral employment agreement "which by [its] terms cannot be performed within the year," Boothby v. Texon, Inc., 414 Mass. 468, 479 (1993), as discussed above, the Court finds that Dr. Shervin has set forth specific admissible facts for a claim of interference with at least a contemplated contract, not necessarily with an existing and enforceable contract.

Further, to the extent Dr. Rubash argues "he has definitely indicated that he has taken no steps to interfere with employment opportunities at [Newton-Wellesley] . . ." and that others have corroborated such, D. 144-1 at 20, there is evidence in the record that Dr. Rubash told Dr. Shervin's recommenders that no open positions were available. Assuming the evidence at trial bears out Dr. Shervin's contentions about a staff position at Newton-Wellesley, a jury could reasonably find that Dr. Rubash tortiously interfered with that opportunity.

2. *The Tortious Interference Claim Against Dr. Herndon Survives*

Dr. Herndon first argues that because Dr. Shervin's intentional interference claim "turns upon the premise that [the] initial probation decision – an event that occurred on February 2, 2007 – impacted her present and potential future employment" and that because she did not file her suit until April 9, 2010, the three-year statute of limitations on intentional interference claims has run pursuant to Mass. Gen. L. c. 260, § 2A. D. 152 at 19. Dr. Herndon further argues that Dr. Shervin cannot establish that he "knowingly induced HCORP to break its contractual relationship with her."[18] Id. Dr. Herndon further contends that he "has never communicated with Dr. Shervin's prospective employers and she did not have a business relationship inuring to her economic benefit with which he interfered." D. 152 at 20.

Dr. Shervin does not specifically address any of Dr. Herndon's arguments in her opposition. See D. 231 at 77–78. Even if this claim is time-barred as to the 2007 probation decision, the Court finds that a jury could conclude that Dr. Herndon tortiously interfered with

_____

[18]To show an intentional interference with contractual relations, Dr. Shervin "must prove that: (1) [she] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) [she] was harmed by the defendant's actions." G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991).

Dr. Shervin's relationship with Partners as well as her HCORP contract by continuing, for discriminatory reasons, to seek to have the initial 2007 probation affirmed.

       3.       *The Tortious Interference Claim Against Partners Survives, But Charitable Immunity Applies*

As discussed above, the tortious interference claims against Drs. Herndon and Rubash shall proceed to trial.  Accordingly, the tortious interference claim against Partners (Count 19) shall also proceed to trial.

The Court finds, however, that Partners qualifies for charitable immunity under Mass. Gen. L. c. 231, § 85K as to this claim.   D. 150 at 19.  The statute provides, in relevant part:

> It shall not constitute a defense to any cause of action based on tort brought against a corporation, trustees of a trust, or members of an association that said corporation, trust, or association is or at the time the cause of action arose was a charity; provided, that if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation, trust, or association, liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs . . . . Notwithstanding any other provision of this section, the liability of charitable corporations, the trustees of charitable trusts, and the members of charitable associations shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.

 Mass. Gen. L. c. 231, § 85K.  A defendant has the burden of proving "both that it is a charitable organization and that the tort complained of fell within the range of activities covered by the cap."  Conners v. Ne. Hosp. Corp., 439 Mass. 469, 470 (2003).

Partners has asserted that it is a charitable organization recognized by state and federal governments.  D. 150 at 19; D. 172 ¶ 2.  Partners also asserts that Dr. Shervin's claims "directly concern her performance as a medical resident and fellow at several hospitals within the Partners system."  Id.; D. 149 ¶ 6.  Given that Dr. Shervin has not disputed the relevant facts and has not

argued in her opposition that § 85K does not apply,[19] the Court finds that Partners falls under the charitable immunity cap for tort damages for the tortious interference claim as articulated in Mass. Gen. L. c. 231, § 85K.  See Keene v. Brigham & Women's Hosp., Inc., 439 Mass. 223, 240 (2003) (affirming application of the statutory cap for a hospital when it was "undisputed that the defendant is a charitable corporation and that it was acting in the performance of its charitable purposes when the harm occurred").[20]

Accordingly, the Court DENIES Drs. Rubash and Herndon's motions for summary judgment as to the tortious interference claims and DENIES IN PART Partners' insofar as the Court finds that Partners is entitled to charitable immunity.

## VI.    Conclusion

For the reasons discussed above, the Court DENIES IN PART Dr. Rubash's motion, D. 144, but ALLOWS it IN PART to the extent that Dr. Shervin cannot rely on conduct that occurred prior to June 5, 2008 for Dr. Rubash's liability; DENIES IN PART Dr. Herndon's motion, D. 145, but ALLOWS it IN PART to the extent that Dr. Shervin cannot rely on conduct that occurred prior to June 5, 2008 for Dr. Herndon's liability; DENIES IN PART Harvard's motion, D. 148, but ALLOWS it IN PART to the extent that Dr. Shervin cannot rely on conduct that occurred prior to December 30, 2008 for Harvard's liability; and DENIES IN PART Partners' motion, D. 149, but ALLOWS it IN PART to the extent that Dr. Shervin cannot rely on

---

[19] See D. 229 ¶¶ 2, 6; Affidavit of Joan Stoddard (D. 157-3 ¶ 4).

[20] The Court notes, however, that § 85K does not apply to the discrimination and retaliation claims against Partners. Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 390 (2005) (ruling that "§ 85K does not apply to limit damages awarded pursuant to a successful claim of unlawful retaliation under G.L. c. 151B"); McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 307 (1st Cir. 1998) (same).

conduct that occurred prior to June 5, 2008 for Partners' liability and Partners is entitled to qualified immunity for the tortious interference claim.

The Defendants' motion to strike, D. 236, is DENIED.   The Defendants' motion for additional time to respond to Dr. Shervin's opposition papers, D. 237 at 9, is also DENIED as moot.   Dr. Shervin's motion for leave to file a surreply to the Defendants' reply briefs, D. 263, which the Court considered in resolving the instant motions, is ALLOWED *nunc pro tunc*.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge